### Chicago, R. I. & P. Ry. Co. v. J. W. Stickman.

1. ORDINARY CARE—*No Recovery Without.*—A person injured in a railroad accident, who was not at the time of the accident in the exercise of ordinary care for his personal safety, can not recover.

2. DAMAGES—*When $5,000 is Excessive.*—A person injured in a railroad accident suffered an incomplete fracture of the tibia of his left leg and was taken to a hospital. There was a partial breakage of the bone, the parts of which were not completely separated, but were in place and in apposition, held there by the bone itself. There were some slight cuts and bruises on the right leg, in one of which the attending physician put several stitches. In twelve days he was discharged from the hospital at his own request, went home, and was in bed there about two weeks; from that time for about two months he walked on crutches and was able to work some. In the spring following he was employed at plowing, harrowing, etc., and walked four miles each day to and from his work, doing the work of a regular hand. He lost a little over three months. *Held*, that a verdict for $5,000 was excessive.

3. RAILROADS—*Duty Toward Travelers upon Adjacent Highways.*—The duties imposed upon a railroad company in a case where a person is traveling upon a highway adjacent and parallel to its track is different from those to which it is subject when passing over a highway in which both it and the traveler enjoy a common privilege, and in which the train and the traveler are about to cross each other's path. The paramount duty of the engineer, as the servant of the company, is to protect his passengers and train. He is not bound to reduce the speed of his train, or to diminish or prevent the inevitable noise attending its operation.

Trespass on the Case, for personal injuries. Appeal from the Circuit Court of Rock Island County; the Hon. WILLIAM H. GEST, Judge, presiding. Heard in this court at the October term, 1900. Reversed and remanded. Opinion filed April 11, 1901.

JACKSON & HURST, attorneys for appellant.

S. R. KENWORTHY and J. M. BEARDSLEY, attorneys for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

John W. Steckman brought this suit against the Chicago, Rock Island and Pacific Railway Company, to recover damages for injuries sustained by him while driving on Moline avenue, otherwise called Fifth avenue, in the city of Rock Island. He recovered a verdict for $5,000, which the court set aside. During the second trial, the jury was discharged by agreement. At a third trial he recovered a verdict for $5,000. A motion by defendant for a new trial was denied. Plaintiff had judgment on the verdict, and defendant appeals.

The cities of Moline and Rock Island are adjoining. Moline avenue runs east and west, and is the main traveled thoroughfare between the business parts of said cities. Where it leaves Moline going west it is north of the tracks of defendant. After the city of Rock Island is reached, Moline avenue turns south and passes under said railroad, and then turns west, and passes for a long distance immediately south of the main tracks and yards of defendant. The dividing line between the street and the railroad ground is marked by a stone curb about six inches high. The first main track of the railroad is about fifteen and one-half feet north of said curb. Plaintiff was a teamster, and on November 3, 1898, was driving west on said avenue, with a load of household goods. In the front of his load was a wooden box, coming above the wagon box. Plaintiff sat on this wooden box, with his legs and feet hanging over the outside in front. He was driving next to the curb. A passenger train bound east came along on the nearest track. When twenty or thirty feet west of plaintiff, steam issued

from the lower part of the locomotive and came around plaintiff's horses. They shied to the south. Plaintiff pulled upon the lines, and at once drew himself off the box, and landed on his feet astride the north tug, behind and close against the legs of the north horse. The engine then gave four short whistles, known as a crossing whistle. Plaintiff pulled on the lines, then jumped over the tug, but fell, and the hind wheel of the wagon passed over his left leg. The team ran till stopped by some one on the street. Plaintiff was taken to a hospital not far distant. It was found he had suffered an incomplete fracture of the tibia or shin bone of his left leg, and some cuts and bruises on his right leg.

1. We consider the damages excessive. There was a partial breakage of the bone. The parts of the bone were not completely separated, but were in place and in apposition, and held there by the bone itself. There were some slight cuts and bruises on the right leg, and in one of them the attending physician put several stitches. In twelve days plaintiff was discharged from the hospital, at his request. He went home and was in bed there two weeks. From that time till the last of the following January, about two months, he walked on crutches and was able to work some during the latter part of that time. Before he ceased using crutches he worked at taking clams out of the river through a hole in the ice. He had a rake, with which he lifted mud, sand and shells. He thinks he lifted out a ton of material during the two or three weeks he worked at that. In the spring following he was employed at plowing, harrowing, etc., in a garden, and while at that work walked two miles each way each day to and from his work. He then became a section hand on a railroad, and did the same work there as any other section hand, shoveling gravel, working a hand car, putting in ties, lifting track, etc. He next worked on the Hennepin canal, where he shoveled dirt and rock. There he took the typhoid fever. After he recovered from that illness he became a woodchopper, and afterward worked in the construction of a reservoir, holding a scraper, etc., and then in a lumber yard. In

C., R. I. & P. Ry. Co. v. Stickman.

whatever employment he has been engaged since this injury he has done the work of a regular hand. He lost a little over three months' time, and ever since has been able to do the work of an ordinary laborer, except during his illness and convalescence from typhoid fever, and once when poisoned by poison ivy. He paid nothing for what services and attendance he received at the hospital, that expense being paid by the public authorities. Since he left the hospital, twelve days after this injury, he never has had occasion to call or consult a physician or surgeon for anything connected with the injury here in question. The fact that he never required medical or surgical attendance after the first twelve days strongly tends to show the injuries were comparatively slight. He claims that while in the hospital he had trouble with his bladder and kidneys, of a character that could not fail to be known to his physician, and of which plaintiff testifies he informed his attendant. In this he is contradicted, both by his physician and his attendant. He claims he has a difficulty in his hip, and had difficulty in stepping upon a hand car when working upon the section, and that he had to be helped upon the car. In this he is corroborated by some of his fellow-workmen, who testify they did help him get upon the car, and is contradicted by as many more, who say he got upon the car unaided, and without any apparent difficulty, the same as any of the other section men. He testifies to various aches and pains, dizziness, numbness, etc., to which he is the only witness. These ailments never required medical advice or treatment. He testified it was because of poverty that he did not seek medical aid; but while he was recovering from typhoid fever, the physician who attended him at the hospital was at his house to see another patient, and asked plaintiff how his leg was, and he replied that it was all right, and made no complaint of his hip, or of any other trouble arising from this injury. We are of opinion that $5,000 is an excessive allowance for plaintiff's injuries. It is urged the verdict can be sustained as exemplary damages. We are of opinion no foundation was laid for such damages.

2.   We think it very questionable whether the jury were warranted in finding that the plaintiff was exercising due care for his personal safety. He was driving his team while sitting upon a smooth planed wooden box, with his feet and legs hanging down in front of the wagon box. The position was so insecure that a man who was riding with him and sitting beside him, and who was to have made the entire journey with him, became alarmed some distance back of the place where this injury occurred, and got off, telling the plaintiff he was afraid he would be thrown and get hurt. Plaintiff's attention had thus been directly called to the insecurity of his seat, only a short time before this accident. He had been warned of the danger. There is considerable proof in the record that this was a runaway team; that one of his horses was tricky, and that he knew it before this accident, and so explained the accident afterward. Plaintiff saw the train approaching, and knew it was on the track nearest him. He could not fail to know any team might shy at a train passing so near, with no fence between. It is a fair conclusion from the entire record that there would not have been any runaway nor any injury to plaintiff, if he had been sitting where he could brace his feet when he tightened the lines on his team. Two women were driving in a single buggy close behind plaintiff, and equally within the influence of the steam and the whistle, and they had no difficulty in controlling their horse. Another team was being driven just ahead of plaintiff, and no accident or injury occurred to it. Plaintiff had to pass some considerable distance, perhaps a mile, along the tracks and yards of defendant. He was acquainted with the locality. Engines and cars were liable to come near him at any moment. When he saw this train coming, he did not change his position, or make any effort to get his feet where he would have the usual control of his team that he would have while sitting in his wagon in the ordinary manner. In view of the character of his team, the warning he had had, his knowledge that the approaching train must pass very near him, the probability that any team

might be frightened by the sight and sound of a train so near, and his insecure position, where he could not pull at all upon the lines without drawing himself off the box and behind the horses, it would seem as if ordinary care required of him such a change of position before the train reached him as would enable him to use an ordinary amount of force in controlling his team, if it should be necessary. If the jury had found he was not exercising ordinary care for his own safety, the conclusion would have met with our approval. It is argued the decision in City of Aurora v. Scott, 82 Ill. App. 616, 185 Ill. 539, conclusively establishes that plaintiff was not negligent, or that a verdict that he was not negligent should not be disturbed. We regard the facts in the two cases as substantially unlike, except that in each case the plaintiff sat on a box higher than the wagon box. In the Scott case, plaintiff had his feet inside the wagon, in a basket of books, where he was apparently able to brace himself to hold his horse. In that case, Scott was driving in the dark, in the traveled track. One fore wheel went into a ditch or tunnel ten or twelve inches deep, just as the rear wheel passed over an elevation equally high. The combined effect of the two, equivalent to depressing the corner where he sat from twenty inches to two feet, threw him off the wagon to the ground. It was there recognized that people with loads have a right to use the street, and ride upon their loads. Scott had taken such precautions to have his feet inside the wagon as to apparently insure his safety. The city was negligent, in having such a hole in a street upon which it invited the public to travel. Scott could not anticipate it. Even then, we said it was a close question whether he was exercising due care in sitting in that position.

3. The declaration charged that the whistle was sounded in an unnecessary and negligent manner, needlessly, recklessly, wantonly and maliciously, with sharp, shrill, loud and unusual sounds; that the cylinder cocks were caused or allowed to be opened, and steam to escape therefrom with a hissing sound, needlessly, wantonly, maliciously and negli-

gently; that an ordinance of said city forbade a locomotive whistle to be sounded within the city "except necessary brake signals, and such as may be necessary to prevent injury to persons or property;" that said whistle was sounded in violation of said ordinance, and was not a necessary brake signal, and was not necessary to prevent injury to persons or property; that an ordinance of said city forbade allowing steam to escape from cylinder cocks of locomotives while running upon any railroad track laid in any street of said city, or when the engine is in immediate proximity to any street or railroad crossing in said city, except that such cocks might be opened to allow condensed steam to escape while such engine was standing, and for three revolutions of the driving wheel after being put in motion; that steam was allowed to escape from this engine in violation of said ordinance; and that the whistle and the steam frightened plaintiff's horses, and caused the injury to plaintiff. The court, after hearing proof in the absence of the jury, refused to admit in evidence the ordinance relating to escaping steam, and no question concerning a violation of that enactment is before us, as no cross-errors are assigned. As to the steam, the case stands as if no ordinance had been in force on that subject.

We are not satisfied that plaintiff proved these allegations of negligence. The testimony of various witnesses, experts in operating locomotives, shows it is often necessary for the safety of the engine when running, that steam shall be permitted to escape. This was not controverted. To show the whistling was unnecessary, plaintiff relied upon the testimony of one Greaser, who was standing nearly three blocks west of the place of the injury, and looking in that direction, and could see as far as the switchman's shanty at the end of Thirty-eighth street, and saw nothing on the track ahead of this train. The accident occurred about ninety feet west of the switchman's shanty, and Greaser testified the shanty obstructed his view beyond. This proof only showed there was nothing within ninety feet of the locomotive requiring the whistle to be blown.

C., R. I. & P. Ry. Co. v. Stickman.

There may have been persons on the track anywhere beyond that limit, requiring the whistle to be blown for the safety of the train and of such persons. The next grade crossing was at Forty-second street, four blocks ahead. The engineer from his raised position in the cab may have seen persons or teams crossing the railroad there, or approaching that crossing from one side or the other, and it may have been entirely necessary for him to give this crossing signal at once. This was a fast train or "flyer," and would reach the crossing more quickly from any given point than a slower train. If the engineer saw such persons or teams, and failed to give the signal at once on discovering them, and they were struck, he might well be guilty of negligence toward them. We doubt if this proof alone warranted the conclusion that the escape of the steam was unnecessary or negligent, or that the whistling was in violation of the ordinance, or unnecessary, or negligent. But plaintiff invokes the doctrine that knowledge of the necessity for either rested specially with the engineer, and having shown there was no apparent necessity, it was for the defendant to prove the facts, if any real occasion existed. This reasoning would be pertinent and forcible in many cases, but we think that the rule can not be justly applied under the facts of this case. This injury occurred November 3, 1898. On the cross-examination of plaintiff defendant sought to elicit from him that he had never made any complaint or claim to defendant about this accident, nor had any one else for him, till the commencement of the suit. Plaintiff objected to the questions and the objections were sustained. The present state of the record justifies the conclusion that the defendant never knew any such accident had occurred at all, or ever heard of plaintiff or his injury, or that defendant would or could be held responsible to him for anything, till this suit was begun, June 19, 1899; and that defendant did not know it would be called upon to account for the manner in which its train was run at that place on that day, till the original declaration was filed, September 8, 1899, over ten months after the occurrence. The engineer did

not hear of the accident till after that date. Of course he could not then remember whether, on the preceding third day of November, he blew a whistle, or permitted steam to escape, ninety feet west of the switchman's shanty, nor what the occasion was if he did so, though he did know by the record that he ran that train on that day. Plaintiff testified the engineer's face was turned in his direction as the engine approached him some distance away, but that he could not say the engineer saw him. The engineer could only testify he did not notice, or had no recollection of seeing, a load of furniture on that street that day, or any accident of the kind here in question. He further testified he did not remember ever using his whistle at that place, but if he did, it was because there was some one on the track. He also explained that at the switchman's shanty there was a switch opening off the track he was running on, and that it was his duty, when running, to watch for all switches, and see that they were properly set; and if any switch was wrong, and he went ahead, he would be held responsible; so that as he passed along the place in question, his attention was necessarily directed to the switch ahead of him. In view of the fact that plaintiff did not apprise defendant of his injury until after the lapse of so much time that it would be impossible for defendant to ascertain why the whistle was blown or steam emitted, we think defendant ought not now to be held negligent, merely because it can not now explain why those acts were done. In such case, it would seem plaintiff ought to establish his allegations without shifting the burden to the defendant on the ground it is the one who knows.

4. The first instruction given at the request of plaintiff left it to the jury to determine, as one of the elements which would go to make a case for plaintiff, whether the engineer saw, "or by the exercise of reasonable care and diligence could have seen, plaintiff and his team upon the highway, and within a short distance of the track upon which said locomotive was then passing." This implied that the engineer owed a duty to plaintiff to see him while

he was traveling on this highway parallel with the railroad right of way, and that he was bound to exercise due care to see him. The jury would naturally understand it to mean that the engineer was as much in duty bound to look out for and see a traveler on a parallel highway as he is to look out for and see persons on a highway approaching a railroad crossing ahead of him. While the engineer, no doubt, owes some duty to a person traveling as the plaintiff was on Moline avenue, yet it is necessarily of a subordinate character. Such person is not approaching the track, and is not about to cross it. He can not be struck or reached by the engine or train. The duties imposed upon the railroad company in such a case are different from those to which it is subject when passing over a highway in which both it and the traveler enjoy a common privilege, and in which the train and the traveler are about to cross each other's path. (Favor v. Boston & Lowell R. R. Co., 114 Mass. 350; L. E. & St. L. C. R. R. Co. v. Lee, 47 Ill. App. 384.) The engineer is not bound to reduce the speed of the train or to diminish or to prevent the inevitable noise attending the operation of the engine and moving of the train on account of a traveler on the adjacent highway. (Lamb v. Old Colony R. R. Co., 140 Mass. 79; 3 Elliott on Railroads, Sec. 1264.) The engineer's paramount duty is to protect his passengers and train; to watch for switches and places of danger on the track he is to travel; to give warning to persons on or approaching the track ahead; to avoid, if he can, injury to persons or animals on or crossing his track, and the like. If he has occasion to give special whistles or emit steam, or make unusual noises, and has time to see if there are teams on a parallel highway near enough to be frightened by them, it would no doubt be his duty to observe them, and if he could, without neglecting his paramount duty, wait till he had reached a point where he would not frighten such teams. But if the safety of his train or the position of persons ahead of him required an instant alarm whistle, or the safety of his engine and train required an immediate emission of steam, we do not doubt

he would have the right and be in duty bound to whistle or emit steam, without regard to travelers on the adjoining highway, or its effect on them. Plaintiff claims the cases of T. W. & W. R. R. Co. v. Harmon, 47 Ill. 298, C. B. & Q. R. R. Co. v. Dickson, 88 Ill. 431, and C. B. & Q. R. R. Co. v. Yorty, 158 Ill. 321, sustain his contention here. In the Harmon case, plaintiff approached a railroad crossing, and, seeing an engine coming, stopped and waited till it passed over the highway. The engine then stopped, and plaintiff started to cross the railroad. The engineer let off steam, which frightened plaintiff's team and caused them to run away, and plaintiff was injured. It was the immediate and direct duty of that engineer to look out for and see plaintiff on the highway there, about to cross the railroad. In the Yorty case, several teams were working at a particular place inside the right of way, and the engineer could not fail to know they were there. If he did not see plaintiff on the opposite side of him, he at least saw the teams on his own side of the track. He caused the whistles to be sounded and steam to escape when directly opposite the team, and thereby plaintiff's team was frightened, and plaintiff was injured. The injury was known to defendant at once, and it could have shown the necessity, if there were any, for the engineer's acts, but did not do so. We do not think what was said in those cases applicable here, under conditions so very different. The part of the first instruction which we have above quoted and disapproved is not contained in the instruction approved in the Yorty case, from which it is said to have been substantially copied. The Yorty case was based upon the willful act of the engineer in whistling unnecessarily at a point where teams were likely to be frightened thereby. The part of the instruction here discussed permitted a recovery for the failure of the engineer to see plaintiff before whistling or emitting steam if he could have seen plaintiff had he made it his special business to look out for him—an entirely different proposition from that involved in the Yorty case. In the Dickson case, the engineer saw plaintiff's team on

the parallel highway, frightened. There was nothing ahead calling for any danger signals. The court said the only material issue for the jury to determine was whether extraordinary whistling occurred after the engineer saw the running team, and the court concluded that the proof warranted the jury in finding that after the engineer saw plaintiff's team was frightened he needlessly blew alarm whistles and kept them blowing till the buggy was overturned and plaintiff injured. What was said in that case is to be considered in connection with the question before the court. The instruction under consideration permitted a recovery though the engineer did not see the team, and the Harmon case has no bearing upon that question. We are of opinion the clause quoted from the first instruction should not have been given without explanations as to the duty of the engineer under such circumstances.

We deem it unnecessary to discuss the other questions argued. For the reasons stated, the judgment is reversed and the cause remanded.